**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**WALTER EDWARDS,
ALIEN # A91-060-021,**

       **Petitioner,**

**vs.**                            **Case Number 4:07cv31-SPM/WCS**

**ALBERTO GONZALES,
MICHAEL CHERTOFF,
MICHAEL ROZOS,
DAVID WING, DAVID HARVEY,
and the DEPARTMENT OF
HOMELAND SECURITY**

       **Respondents.**

_____/


## REPORT AND RECOMMENDATION

      This case was initiated on January 29, 2007, with the submission of a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. Doc. 1. Petitioner, who is represented by counsel, asserted he was a native and citizen of Saint Vincent and the Grenadines, but had been in the United States since November of 1968. At the time of filing, Petitioner alleged having been in detention pending removal for over thirty-one months. Doc. 1. The Respondents filed an Answer on June 8, 2007. Doc. 12. On July 30, 2007, Petitioner filed his Reply. Doc. 16.

Petitioner seeks release from what is claimed to be an indefinite period of custody.  Doc. 1.  Petitioner does not challenge the final order of removal.  Rather, Petitioner alleges he has been held beyond the presumptively reasonable period of detention as established by <u>Zadvydas v. Davis</u>, 533 U.S. 678 (2001), and asserts his entitlement to release.

**Summary of this report and recommendation**

Because the record in this case is so long but the claim so frivolous, a short summary is in order.  Petitioner came into INS custody in 1992 and was released on parole pending a removal hearing.  Petitioner's friend, Lorenzo Forrest, posted a $10,000 bond.

Petitioner failed to attend his deportation hearing in the early part of 1993 and absconded.  He was deported *in absentia* in 1994.

In 1996, Forrest, the bond obligor, told the INS that he thought he could help locate Petitioner in the Fort Pierce, Florida, area.  Immigration authorities, for reasons unclear here, cancelled the bond and returned the bond money with interest to Forrest *before* they had located Petitioner and had him again in custody.  Petitioner was located by the INS, now ICE, in 2004 when he was found in a county jail in Florida.  Removal proceedings again commenced.

Petitioner told the consulate of his country, Saint Vincent and the Grenadines, that the United States owed him the $10,000, despite the fact that he absconded in the first place and it was his friend who posted the bond.  In 2004, Petitioner sued to get the money back, but in 2005, he dismissed the suit and there is no civil suit pending now.

Early in the process the consulate had issued travel documents but most recently the consulate has withheld travel documents due to Petitioner's claim that the bond money is his.

At issue is whether this dispute over the bond money is good cause to not cooperate with the authorities of Saint Vincent and the Grenadines to obtain travel documents to facilitate removal.  Plainly it is not.

**Claim of the § 2241 petition**

Petitioner is a native and citizen of Saint Vincent and the Grenadines, having been born there on May 27, 1946.  Doc. 1, p. 1.  Petitioner arrived in the United States in November of 1968.  *Id.*, at 2.

Petitioner alleges that he was ordered removed.  *Id.*  Petitioner alleges that he has made efforts to facilitate his deportation, but was told that Saint Vincent's government had issued travel documents for him which have now expired or lapsed.  *Id.*, at 2, 3. Petitioner states that he never received any communication from the Department of Homeland Security concerning the documents or their expiration.  *Id.*, at 4, 5. Additionally, there is a dispute with the Department of Homeland Security concerning a "$10,000 bond of the obligor."  *Id.*  It appears that the embassy is reluctant to issue travel document because of the dispute.  *Id.*, at 3.  Petitioner asserts it is unlikely that he will "be removed in the reasonably foreseeable future."  *Id.*  Petitioner is currently detained in Wakulla County Jail.  *Id.*

**Evidence in this record**

Petitioner is not a citizen or national of the United States.  Doc. 12, p. 2.

Petitioner is deportable under § 241(a)(1)(B) and § 241(a)(2)(A)(i) of the Immigration and

Nationality Act.  *Id.*  Petitioner has a history of criminal convictions and numerous arrests

which did not result in convictions.  *Id.*, at 3-4; *see also* ex. 1 (declaration of Terry

Michael); doc. 12-2, pp. 4-5.[1]  He was encountered by Immigration officials in 1992 at the

Lake County Jail in Tavares, Florida, and served with an Order to Show Cause, a Notice

of Hearing, a Warrant for Arrest, and Notification of Conditions of Release or Detention.

Doc. 12, at 2, 4.[2]

Petitioner entered INS custody in November, 1992, but was released on bond on

December 14, 1992.  *Id.*, at 4; Ex. 1, doc. 12-2, p. 6; Ex. N, doc. 12-4.  "Lorenzo Forrest

of 3108 Hibiscus Avenue, Ft. Pierce, Florida, was the obligor and the bond was

conditioned for the delivery of [Petitioner] in the amount of $10,000.00."  Doc. 12-2, p. 6

(ex. 1); *see also* Ex. F, doc. 12-3, p. 24.  *Lorenzo Forrest* presented a cashier check in

the sum of $10,000.00.  Ex. F, doc. 12-3, p. 26.  Petitioner plainly did not post cash for

his release.

---

[1] All exhibits referenced are to those attached to document 12, the Answer, as
Petitioner has not presented any documentary evidence.  The exhibits will be
referenced first as they appear in paper form, and second as they appear on the
electronic docket followed by the page number assigned by the electronic case filing
(ECF) system.  For example, Doc. 12-2 is exhibit 1; Exhibit A is docketed as Doc. 12-3;
Exhibit N is docketed as Doc. 12-4.

[2] Petitioner "was processed as an alien found in the United States without inspection
by an immigration officer and is amenable to removal under Sections 238(b) of the
Immigration and Nationality Act."  Doc. 12-2, p. 3; ex. 1.  Petitioner is "deportable under
section 241(a)(1)(B) & 241(a)(2)(A)(i) of the Act."  *Id.*

Petitioner failed to appear at the June 23, 1993, hearing and on January 20, 1994, Petitioner was ordered deported *in absentia.*  Doc. 12, p. 4.  A Warrant of Deportation was issued on January 20, 1994.  *Id.*; *see also* Ex. 1, doc. 12-2, p. 6; doc. 12-3, p. 29.

Some two years later, on March 5, 1996, a Notice to Deliver Alien was issued to Lorenzo Forrest and he was required to deliver Petitioner to the INS office on April 4, 1996.  Doc. 1, p. 5.  The Notice was sent by certified mail to Lorenzo Forrest at 3108 Hibiscus Avenue, Ft. Pierce, Florida, and received on March 11, 1996.  Docs. 12-2, 12-3 (exhibits 1, H).  "The return receipt was signed by Lorenzo Forrest and sent back to the INS office in Miami."  *Id.*

A note was in Petitioner's file, signed by E. Jay DO/MIA on April 4, 1996, indicating the obligor (Lorenzo Forrest) appeared in person in Miami at the INS office and said he was "unable to produce" the Petitioner.  Ex. I, doc. 12-3 p. 37; doc. 12, p. 5.  However, he reported that Petitioner was still in the Ft. Pierce area operating a trailer truck on the interstate, and the obligor said he would help locate and apprehend Petitioner.  *Id.*  The last comment on the note indicated the bond would "be cancelled as the order [was] over 6 months old."  *Id.*  On July 20, 1996, the Immigration Bond on Petitioner was cancelled and a copy of the cancelled bond was forwarded to the Eastern Regional Office in South Burlington, Vermont.  Ex. 1, doc. 12-2, p. 7.

On December 9, 1996, an attorney for the obligor through his attorney, wrote a letter to the INS stating that the bond had been cancelled "as the alien had fulfilled all of the conditions," and inquired why the bond money had not yet been returned to the obligor.  Doc. 12, p. 5; Ex. K, doc. 12-3, p. 42.  The letter to INS reported that Mr. Forest

sent the required documentation to the Miami office on September 3, 1996, and it was received on September 13, 1996. *Id.* Since it had been almost twelve weeks, the attorney sought to obtain the refund of the bond on behalf of Forrest. *Id.* The Bond Transaction History in the Management Information System of the INS reports that on December 12, 1996, the "bond was disbursed with interest to the obligor in the amount of $11,198.35." Doc. 12, p. 5; Ex. L, doc. 10-3, p. 46. That report does not state to whom the money was disbursed, but it is a reasonable assumption that it was disbursed to the obligor, Forrest.

Petitioner was located in the St. Lucie County Jail and a detainer was placed on him on January 16, 2004. Doc. 12, p. 6; Ex. M, doc. 12-3, p. 49. Petitioner entered the custody of ICE on January 20, 2004, at the Krome Service Processing Center. Doc. 12, p. 6. On February 4, 2004, the first request for a travel document was made to the Consulate General of Saint Vincent and the Grenadines by the Bradenton ICE office. *Id.*; Ex. N, doc. 12-4, p. 2. Petitioner was served an I-229(a) notice on March 26, 2004, and a "Notice to Alien of File Custody Review." Doc. 12, p. 6; Ex. O, doc. 12-4, pp. 11-14. Petitioner was advised of the requirement that he "make timely application in good faith for travel of other document necessary" for his removal and that he could be subject to further criminal proceedings if he hampered or prevented his removal. Doc. 12, p. 6; Ex. O, doc. 12-4. Petitioner refused to sign receipt of either document. Doc. 12, p. 6; Ex. O, doc. 12-4, pp. 11-12.

Petitioner was scheduled to be removed from the United States to Saint Vincent and the Grenadines on June 6, 2004. Doc. 12, p. 6. Petitioner refused. *Id.*; Ex. P, Doc.

12-4, p. 16.  Officers Wood and Lunnon went to pick up Petitioner at the Manatee County Jail as he was "scheduled to be deported from the United Stated [sic] to Saint Vincent." *Id.*  Petitioner "stated that he would not go until he received his money (10,000 dollars)." Doc. 12, p. 6.  Petitioner said that a "friend had his money and he wanted to know how to get it before he left the facility."  *Id.*  Supervisor Vasilopoulos talked with Petitioner about his money, Petitioner "still refused to go and the trip was canceled."  *Id.*  The memo states that the removal trip would "be rescheduled on another flight at a later date."  *Id.* Officer Wood reported in his memorandum about the matter that "supervisor Vasilopoulos made the decision To postpone the escort to Saint Vincent pending further investigation into this matter."  Ex. P, doc. 12-4, p. 17.

On June 9, 2004, the Bradenton ICE office faxed a travel itinerary for Petitioner to the Consulate General of Saint Vincent and the Grenadines.  Doc. 12, p. 7; Ex. Q, doc. 12-4, p. 19.  An airline ticket was purchased.  Doc. 12-4, pp. 20-21.  An emergency travel document, an "emergency passport," was sent from the Consulate General of Saint Vincent and the Grenadines to ICE in mid-June, 2004.  Ex. R, doc. 12-4, p. 23.  The emergency passport, which is valid only "for a single journey," was issued on June 10, 2004, and would expire on July 5, 2004.  *Id.*

Deportation Officer Jose Velez interviewed Petitioner on September 10, 2004, and informed him "that he would be escorted [to Saint Vincent] for failure to depart by refusing to leave."  Ex. S, doc. 12-4, p. 26; doc. 12, p. 7.  Officer Velez noted that memoranda were in "the file indicating the first attempt to remove Mr. Edwards."  *Id.*

Petitioner replied, "They will have to kill me or shoot me if they try to remove me."  *Id.*

Officer Velez concluded:  "It is apparent that he will refuse again to be removed."  *Id.*

On October 21, 2004, another request for travel documents was submitted to the

Consulate General of Saint Vincent and the Grenadines.  Doc. 12, p. 7.  The request

from Respondent David Wing, the Officer in Charge, provided the previously issued and

now expired emergency travel document for Petitioner, "along with two additional photos

for the issuance of a new document."  Ex. T, doc. 12-4, p. 30.  The request advised that

a new itinerary was being prepared for Petitioner and would be provided upon

completion.  *Id.*  The Consul General denied the request on November 24, 2004, stating

that he would not issue travel documents for Petitioner because of a "current law suit

pending on the alien's behalf" concerning the ten thousand dollar bond claim.  Ex. U,

doc. 12-4, p. 46; doc. 12, p. 7.  Petitioner's scheduled removal was cancelled for the

second time.  *Id.*  The Consulate General of Saint Vincent and the Grenadines faxed an

email from Petitioner's attorney to Deportation Officer Caputo on November 29, 2004.

Doc. 12, p. 7; Ex. V, doc. 12-4, p. 49.  Petitioner's attorney had filed a lawsuit in St. Lucie

County civil court concerning Petitioner's bond claim.  *Id.*

On December 21, 2005, a Post Order Custody Review was completed.  Doc. 12,

p. 8; Ex. W, doc. 12-5, p. 2.  The review, which included Petitioner's lengthy criminal

history,[3] recommended further detention.  Doc. 12, pp. 8-9; Ex. W., doc. 12-5, p. 8.  The

review noted that Petitioner had twice refused removal, was continuing to resist removal,

---

[3] Petitioner has a history of violence which was noted.  That history included a
seven-year sentence for firing into an occupied vehicle.  Doc. 12, p. 8.

and he had stated that they would have "to kill" him or shoot him to effect his removal. Doc. 12, p. 8; Ex. W, doc. 12-5, p. 7.  One reason for Petitioner's refusal was his desire to collect on the $10,000 bond contract.  *Id.*  Petitioner was informed "the ICE was not responsible for what happened to his bond" and that he "had absconded and was not able to be located."  *Id.*  Furthermore, he "never submitted a change of obligor, form I-395."  *Id.*  The review form also explained that ICE had gotten "approval for a second travel document" and then, after Petitioner was transferred to the ICE Krome facility[4] "the removal was delayed."  *Id.*  "The consul then decided to not send out the second travel document because of the pending lawsuit that [Petitioner] is pursuing."  *Id.*  Petitioner was notified by letter on January 11, 2005, that his detention would continue.  Doc. 12, p. 9; Ex. X, doc. 12-5, p. 10.  It appears that Petitioner signed for receipt of the Decision to Continue Detention.  Ex. A, doc. 12-5, pp. 11, 15-16.

On February 8, 2005, Petitioner was issued another Notice of Failure to Comply, served on February 14, 2005.  Doc. 12, p. 9; Ex. Z, doc. 12-5.  Petitioner refused to sign his receipt of the Notice.  *Id.*  Petitioner was again served the I-229(a) form and informed of § 243(a)'s requirements to assist in removal efforts and not act to hamper or prevent removal.  Doc. 12, p. 9; Ex. BB, doc. 12-5.  Petitioner was also provided the Instruction Sheet which listed requirements that Petitioner must provide within 30 days.  Doc. 12, p. 9-10; Ex. BB, doc. 12-5.  Again, Petitioner refused to sign his receipt of the documents. *Id.*, at 10; *see* ex. BB.

---

[4] Krome is located in Miami.  His plane ticket for the first attempted removal departed from Miami.

On February 11, 2005, another request for assistance in obtaining a travel document was sent.  Doc. 12, p. 9; *see* Ex. AA, doc. 12-5.  That request makes clear that the Consulate twice approved travel documents for Petition:

> The first attempt for removal was cancelled because the subject refused to be removed.  The second attempt was aborted because the Consul decided not to issue a travel document, although he did commit to providing the document.  The Consul decided that he no longer would issue a travel document because Mr. Edwards has a civil lawsuit against the obligor of the bond.  The bond was cancelled on 07/26/1996.

Ex. AA, doc. 12-5, p. 22.  The letter also provided greater explanation of the circumstances on the bond:

> In reference to the bond, Mr. Edwards [Petitioner] has stated that the money belonged to him.  Although, Legacy INS at that time was unable to locate him.  The obligor was not able to produce him.  The bond was cancelled in Miami because it was an old bond posted under an order to show cause.  It [was] over six months since a demand was made on the case.  Mr. Edwards never submitted a change of obligor, form I-395.  Therefore, the money was sent to the obligor by the bond management office.

*Id.*  The request closed by noting Petitioner was "still refusing removal and cooperation to obtain a travel document" and advising that the Consul would not issue travel documents because of the lawsuit.  *Id.*

On March 18, 2005, Petitioner was served another I-229(a) form, provided § 243(a) requirements and, again, he refused to sign for his receipt.  Doc. 12, p. 10; Ex. CC, doc. 12-5.  On April 18, 2005, and May 18, 2005, he was served with another I-229(a) form and provided the § 243(a) requirements.  Doc. 12, p. 10; Exs. DD, EE, doc. 12-5.  Once again, he refused to sign and acknowledge his receipt.  *Id.*  This same process happened again on July 15, 2005, August 15, 2005, and September 22, 2005.

Doc. 12, p. 11; Exs. FF, GG, and HH, doc. 12-5.  On September 22nd, he was also given

another Instruction sheet and required to provide the listed documents within 30 days.

Doc. 12, p. 11; Ex. HH, doc. 12-5.  He did not do so, nor would he even sign for receipt

of the document.  *Id.*

Petitioner's attorney, David Lemus [sic, Lamos], was called on October 25, 2005,

concerning the on-going civil lawsuit.  Doc. 12, p. 11; Ex. II, doc. 12-5, p. 42.  Four

messages were left for him which were not returned.  *Id.*  Petitioner "continued to be

uncooperative."  *Id.*

The civil suit was filed against Lorenzo Forrest, the bond obligor.  Ex. JJ, doc. 12-

5, p. 44.  The case number was 562004CC2627, which indicates that it was filed in 2004.

*Id.*  On December 7, 2005, Petitioner voluntarily dismissed the suit.  *Id.*  No basis for the

dismissal was stated in the Notice.  *Id.*  Forrest was represented by the same attorney

who sought and obtained refund of the bond money.  *Id.*

Petitioner was issued another Notice of Failure to Comply on February 15, 2006.

Doc. 12, p. 12; Ex. KK, doc. 12-5.  Petitioner refused to sign for receipt of the Notice.  *Id.*

Petitioner was served another I-229(a) form, advised of § 243(a)'s requirements, and

given an Instruction sheet with the required information he must provide to ICE within 30

days.  *Id.*  Petitioner continued to refuse to sign.  *Id.*  On that same day, Petitioner was

issued a letter from ICE noting that his refusal on June 6, 2004, to "board an aircraft

departing the United States" was "a direct attempt to hamper [his] removal."  *Id.*

Petitioner was reminded that he must assist in the removal process.  *Id.*

A travel document assistance letter was sent to Homeland Security headquarters in Washington on February 15, 2006.  Doc. 12, p. 12; Ex. LL, doc. 12-6.  On that same day, a travel document request was re-submitted to the Embassy for Saint Vincent and the Grenadines.  *Id.*  The request noted that Petitioner had been given a hearing before an Immigration Judge, but "he failed to appear."  *Id.*  He was ordered removed in 1994 and was "now ready for removal . . . ."  *Id.*  The request included a copy of the dismissal of Petitioner's civil case concerning the claim for return of the bond money.  *Id.*  Another travel document request was faxed to the Consulate on April 27, 2006.  Ex. MM, doc. 12-6.

On March 28, 2006, Petitioner was issued another Notice of Failure to Comply, which he continued to refuse to sign, an I-229(a) form, the § 243(a) requirements to assist in removal efforts and not prevent or hamper one's removal, and another Instruction Sheet with every item checked, revealing Petitioner had not provided any documentation yet to ICE officials.  Doc. 12, p. 13; Ex. NN, doc. 12-6.  Petitioner was simultaneously served with another letter advising that he was subject to criminal prosecution for his failure to assist in his removal and his prior refusal to board a departing flight.  *Id.*

Deportation Officer Terry Michael called the Office of the Consulate of Saint Vincent and the Grenadines on March 28, 2006, and explained that Petitioner's civil case had been dismissed, and that a removal order had been entered.  Doc. 12, p. 13.  He was told to request the travel documents from the Consulate in New York.  *Id.*  On that

same day, March 28, 2006, another formal request was sent by Michael Rozos, the field office director.  Ex. OO, doc. 12-7, p. 2.

On April 27, 2006, Petitioner was issued yet another Notice of Failure to Comply, an I-229(a) form, the § 243(a) requirements to assist in removal efforts and not prevent or hamper one's removal, and another Instruction Sheet.  Doc. 12, pp. 13-14; Ex. PP, doc. 12-7.  Petitioner continued to refuse to sign to acknowledge receipt of the forms.  *Id.* Petitioner was additionally served another "Reminder Letter" which explained again that any action to prevent or obstruct his removal or issuance of a travel document would subjugate him to criminal prosecution under 8 U.S.C. § 1253(a).  Doc. 12, p. 14; Ex. PP, doc. 12-7.  Also on April 27th, an inquiry was submitted from Deportation officer Terry Michael concerning assistance from Headquarters and another travel request was sent to the Consulate.  Doc. 12, p. 14; Ex. QQ, doc. 12-7.  That request again explained that Petitioner's "civil court case was dismissed on December 7, 2005 and there [were] no pending court cases at this time."  Ex. QQ, doc. 12-7, p. 48.

Sometime after May 1, 2006, another follow-up with the Consulate was undertaken in an attempt to obtain travel documents for Petitioner.  Doc. 12-8 (ex. RR). Officer Michael sent a facsimile on May 10, 2006, to the Consulate General inquiring on the status of the travel document request.  Doc. 12, p. 14; Ex. SS, doc. 12-8.

On May 16, 2006, Petitioner was issued another Notice of Failure to Comply, which he continued to refuse to sign, and another "Reminder Letter."  Doc. 12, p. 14; Ex. TT, doc. 12-8.  On June 16, 2006, Petitioner was served with another I-229(a) form and advised once again about the § 243(a) requirements to assist in removal efforts and not

prevent or hamper his removal.  Doc. 12, pp. 14-15; Ex. UU, doc. 12-8.  Petitioner was

given another Instruction Sheet noting the various pieces of information requirements he

must provide or be subject to criminal prosecution under 8 U.S.C. §1253(a).  *Id.*

Petitioner was also sent another "reminder letter" advising him of possible criminal

prosecution.  *Id.*

On June 20, 2006, Petitioner was issued another Notice of Failure to Comply for

his continued failure to cooperate and provide a letter to his Consulate.  Doc. 12, p. 15;

Ex. VV, doc. 12-8.  On July 21, 2006, Mr. Michael inquired of the ICE Debt Management

Center in Burlington, Vermont about Petitioner's bond claims and was given the same

information previously provided, that the bond was paid on December 12, 2006, to

Lorenzo Forrest at 3108 Hibiscus Avenue, in Ft. Pierce, Florida.  Doc. 12, p. 15.

On or about August 21, 2006, Petitioner was issued another Notice of Failure to

Comply, an I-229(a) form, the § 243(a) requirements to assist in removal efforts and not

prevent or hamper his removal, and another Instruction Sheet.  Doc. 12, pp. 15-16; Ex.

WW, doc. 12-9.  Petitioner continued his refusal to sign the forms and acknowledge his

receipt.  *Id.*  In addition to the Instruction Sheet,[5] he was served another reminder letter

of possible criminal prosecution.  *Id.*

---

[5] Petitioner was directed to provide ICE with a family tree including dates of birth,
nationalities, addresses, and phone numbers for such persons, whether in Petitioner's
country of nationality or citizenship or elsewhere his past residences, list schools
attended, and the like.  Ex. WW, doc. 12-8.  Petitioner was also required to provide ICE
with a valid passport and return the requested documents by August 31, 2006.  *Id.*
Nothing was received from Petitioner.

On September 1, 2006, an email request sought an update from Headquarters on the issuance of a travel document.  Doc. 12, p. 16, Ex. XX, doc. 12-8, p. 22 .  The email noted that the Consulate might "be stalling for the alien's benefit" and Officer Michael stated they were "in dire need of" assistance from HQ.  *Id.*

On October 11, 2006, another travel document request was sent seeking assistance from HQ in facilitating the presentation of the case to the Saint Vincent Embassy.  Doc. 12, p. 16; Ex. YY, doc 12-8.  On the same day, October 11th, Petitioner was issued another Notice of Failure to Comply, an I-229(a) form, the § 243(a) requirements to assist in removal efforts and not prevent or hamper his removal, another Instruction Sheet, and a reminder or directive letter.  Doc. 12, pp. 16-17; Ex. ZZ, doc. 12-9.  Petitioner refused to sign for the forms.  *Id.*  The directive letter noted that by October 23, 2006, Petitioner was to have provided ICE with information such as a family tree, list of past residences, schools attended, and the like, but his failure to comply was "a direct attempt to hamper [his] removal."  Ex. ZZ, doc. 12-9.

On November 29, 2006, Petitioner was issued a Notice of Failure to Comply and he refused to sign his receipt.  Doc. 12, p. 17; Ex. AAA, doc. 12-9.  The following day, November 30th, Petitioner was served an I-229(a) form, the § 243(a) requirements to assist in removal efforts and not prevent or hamper his removal, an Instruction Sheet, and a Directive Letter.  Doc. 12, p. 17; Ex. BBB, doc. 12-9

On December 1, 2006, Mr. Michael called the Consulate General of Saint Vincent and the Grenadines in New York on behalf of Petitioner.  Doc. 12, p. 18; Ex. 1, doc. 12-2, p. 24.  Petitioner advised the Consulate that he refused "to leave the United States

without" his bond money.  Doc. 12, p. 18; Ex. DDD, doc. 12-9.  The Consul, Mr. Cozier,

spoke to Petitioner for approximately five minutes and then Petitioner handed the

telephone to Deportation Officer Michael.  Doc. 12, p. 18; Ex. 1, doc. 12-2, p. 24.  Mr.

Michael advised that the bond money had been paid to the obligor, Forrest, and then Mr.

Cozier (the Consul for Saint Vincent and the Grenadines) told Mr. Michael that the

United States government was corrupt and the government should return Petitioner's

money to him at once.  *Id.*  Mr. Michael again explained the facts to Mr. Cozier, who

replied that Saint Vincent would not issue a travel document for Petitioner until the matter

was resolved.  *Id.*

   On December 6, 2006, Mr. Michael sought to obtain a "Treasury Trace" on the

check which had been sent to Mr. Lorenzo Forrest some ten years ago on December 12,

1996.  Doc. 12, p. 18; Ex. 1, doc. 12-2, p. 25.  Mr. Michael was advised that the bond

was paid out in 1996 and the statute of limitations had passed.  *Id.*  The U.S. Treasury

only keeps check images for six years and six months.  Proof that the check was cashed

is in the fact that the check never came back to the DMC.  *Id.*  If the check had remained

uncashed, and the checks are only good for one year, then the "check comes back to

the DMC stale dated."  *Id.*  The Treasure sends a canceled check to the DMC to advise

that the check was not cashed."  *Id.*  Thus, Mr. Michael was advised that the only

documentary proof for the bond was a print-out from the Bond Management Information

System "which would state the name of the obligor and the address where the check

was sent along with the date that it was paid."  *Id.*; *see* Ex. CCC, doc. 12-9.

On December 7, 2006, Petitioner was issued another Notice of Failure to Comply for his failure to cooperate and provide the requested documents.  Doc. 12, p. 19; Ex. DDD, doc. 12-9.  Again, Petitioner refused to sign for receipt of the document when served on December 15, 2006.  *Id.*  Petitioner was simultaneously provided with another notice letter of possible criminal prosecution, an I-229(a) form, and advised of § 243(a)'s requirements.  Doc. 12, p. 19, Ex. EEE, doc. 12-9.  Petitioner was provided another Instruction Sheet with requirements for him to provide numerous documents and a Reminder Letter.  *Id.*  Furthermore, Petitioner was served and read his Miranda Rights, in the event he would be subject to prosecution under 8 U.S.C. § 1253(a) for preventing his removal or obstructing the issuance of a travel document.  *Id.*  He was reminded that Lorenzo Forrest signed as the obligor and paid Petitioner's bond and the obligor was refunded the bond money back in 1996 after the bond was canceled.  *Id.*  Petitioner was advised that his refusal to leave the United States and his non-cooperation were direct attempts to prevent his removal.  *Id.*

A letter was sent from Deportation Officer David Bryant to the Consulate General of Saint Vincent and the Grenadines on January 11, 2007.  Doc. 12, p. 19-20; Ex. 1, doc. 12-2, p. 27; Ex. FFF, doc. 12-9.  That letter referenced the Consul's refusal to issue a travel document for Petitioner.  *Id.*  Officer Bryant advised that Petitioner was not owed any money from the United States.  The letter further explained that Plaintiff claims "that he gave a friend bond money to pay his bond."  *Id.*  "That would make that friend the obligor.  When his bond was cancelled, the obligor was refunded the money, as has always been the procedure."  *Id.*  The letter reiterated that the issue of the bond money

should not "be used to withhold emergency travel documentation."  *Id.*  The Consulate was urged to "stop listening to these fabrications and issue the document based upon the facts presented in regards to his citizenship."  *Id.*

On January 23, 2007, Deportation Officer Terry Michael re-submitted another request for the issuance of a travel document for Petitioner to the Embassy of Saint Vincent and the Grenadines.  Doc. 12, p. 20; Ex. GGG, doc. 12-9.  The request also sought to have a written explanation as to why the Consulate had not issued a travel document for Petitioner.  *Id.*

On January 23, 2007, Petitioner was issued another Notice of Failure to Comply for his failure to cooperate and provide the requested documents.  Doc. 12, p. 20; Ex. HHH, doc. 12-9.  Petitioner was specifically told that his refusal to leave the United States without his bond money meant he had failed to assist in his removal and was the cause of the extended detention.  *Id.*  Again, Petitioner refused to sign for receipt of the document when served on January 24, 2007.  *Id.*  On that same day he was served with another I-229(a) form, an Instruction Sheet, and advised again of § 243(a)'s requirements and his Miranda rights.  Doc. 12, pp. 20-21; Ex. III, doc. 12-9.

Petitioner also received a letter requiring him to send a letter to his Consulate by January 31, 2007, requesting a travel document.  Doc. 12, p. 21; Ex. III, doc. 12-9. Furthermore, Petitioner was served a Notice of Litigation letter which informed Petitioner that ICE intended to remove him pending issuance of a travel document and Petitioner was to notify ICE of any current or pending federal litigation.  *Id.*  Petitioner was provided with names and phone numbers for the Embassy of Saint Vincent and the Grenadines, as

well as the New York Consul General Mr. Cosmus Cozier.  *Id.*  Petitioner refused to sign

and acknowledge the documents and also stated, for the first time, that he could not

"read and write."  Ex. 1, doc. 12-2, p. 29.

On January 26, 2007, a letter was written by Ambassador Ellsworth I. A. John

from the Embassy of Saint Vincent and the Grenadines which stated: "I am aware of the

seriousness of this matter but since our Consulate is currently dealing with it, I've

forwarded the documents to Consulate General Cosmos Cozier for his urgent action."

Doc. 12, p. 21, Ex. JJJ, doc. 12-9.  On February 2, 2007, Petitioner had an interview with

the Consulate in New York and said he did not want to go home until he got his money.

Ex. KKK, doc. 12-9, p. 50.  He advised the Consulate that he had no family in his native

country and no place to stay, so he wants more time to get his money.  *Id.*

On April 15, 2007, Petitioner was issued another Notice of Failure to Comply,

which he continued to refuse to sign, and an Instruction Sheet, an I-229(a) form, and

advised once against about § 243(a) requirements to assist in removal efforts and not

prevent or hamper his removal.  Doc. 12, p. 22; Exs. LLL, MMM, doc. 12-9.  Petitioner

received another I-229(a) form and read § 243(a)'s requirements again on April 30,

2007.  Doc. 12, p. 22; Ex. NNN, doc. 12-9.  Finally, on May 11, 2007, an Urgent Travel

Document request was sent to HQ/DRO for immediate assistance.  Doc. 12, p. 23; Ex.

OOO, doc. 12-9.

## Petitioner's Reply, doc. 16

Petitioner, through counsel, filed a reply to the Government's Answer.  Doc. 16.

Petitioner contends that Respondents incorrectly state he arrived in the United States in

1972, but Petitioner asserts he arrived in 1968 "as a documented immigrant agricultural

worker . . . ."  Doc. 16, p. 2.  This is irrelevant to determination of the issues in the

petition as it is undisputed that Petitioner is not a United States citizen nor a lawful

permanent resident.

Petitioner argues that the Government has provided conflicting reasons as to why

Petitioner's removal was delayed previously when the Government had a travel

document for him.  Doc. 16, p. 8.  In response to the Respondents' argument that

Petitioner's actions caused the delay and resulting expiration of the travel document,

Petitioner contends that "the Government voluntarily withheld deportation while in

possession of valid travel documents."  *Id.*, at p. 7.  Petitioner contends he was advised

by government officials to file the lawsuit to recover the money, and advised by

Supervisor Vasilopoulos that he would not be deported at the time but he would "have

the time to file a lawsuit."  *Id.*, at 7.  In other words, Petitioner is aware that his removal

was cancelled and the travel documents expired because Petitioner was "being allowed

time to litigate his issues about the return of his 10,000 bond."  *Id.*, at 8.  Indeed,

Petitioner states that he "did not stop removal" but rather, the "Government voluntarily

stopped removal on behalf of the Petitioner over the bond issue."  *Id.*, at 10.

Petitioner also acknowledges that he questioned government officials as to how

he could recover his $10,000, and Petitioner continues to request proof of the "return of

his 10,000 dollar bond."  *Id.*, at 3-4.  Petitioner contends that Officer Jose Velez told him

that something was wrong concerning the bond money being returned.  Petitioner states

he said, "Something is wrong, they have your money, they don't give back bond money

when you didn't show up."  *Id.*, at 4; *see also* p. 8.  Petitioner acknowledges, however,

the Government's statement that the "bond was correctly cancelled July 20, 1996

because it was six months after the final order."  *Id.*, at 8.  Petitioner insists he was not

aware of that reason and only had Officer Velez's statements to consider.  *Id.*

Petitioner points out that his removal was not effected while he initiated his civil

case, at the Government's suggestion.  He explains that his civil case was voluntarily

dismissed on his own motion.  Doc. 16, p. 5.  Petitioner contends he had no choice but to

voluntarily dismiss the lawsuit because the government would not "transfer him so that

he could participate in the suit . . . ."  *Id.*  Petitioner goes so far as to assert that "[t]he

Government prohibited [Petitioner] from prosecuting his civil case."  *Id.*, at 10.  However,

Petitioner acknowledges that he had an "attorney to prosecute his case."  *Id.*, at 9.

Petitioner "vehemently denies ever having stated, "They will have to kill me or

shoot me if they try to remove me."  Doc. 16, p. 4.  Petitioner also refuses to accept the

statements of "Ms. Corbin of the DMC as meeting the Government's burden of proof."

*Id.*, at 5-6.  Thus, Petitioner maintains that sufficient proof has not been presented to

show that the obligor received and cashed the check.  *Id.*, at 6.  Petitioner even suggests

that "[t]he Government does have the burden of proof and that burden has not been

met."  *Id.*, at 10.

**Analysis**

Because Petitioner is not challenging a final order of removal, but only seeking

release from detention pursuant to <u>Zadvydas v. Davis</u>, 533 U.S. 678, 121 S.Ct. 2491,

150 L.Ed.2d 653 (2001), this Court has jurisdiction over this § 2241 habeas petition.  In

Zadvydas, the United States Supreme Court considered a challenge to 8 U.S.C. §

1231(a)(6) and was asked to decide whether the statute authorized indefinite detention

of a removable alien.[6]  The Court held that the continued detention of legal permanent

aliens beyond the mandated 90-day removal period was permissible under the

Constitution, but only for as long as was "reasonably necessary to bring about that

alien's removal from the United States."  *Id.*, at 689, 121 S. Ct. at 2498.  The Court

concluded that "once removal is no longer reasonably foreseeable, continued detention

is no longer authorized by statute."  *Id.,* at 699, 121 S.Ct. at 2503.  For sake of

uniformity, the Court announced "the presumptive period during which the detention of

an alien is reasonably necessary to effectuate his removal is six months; after that, the

alien is eligible for conditional release if he can demonstrate that there is 'no significant

likelihood of removal in the reasonably foreseeable future.' "  Clark v. Martinez, 543 U.S.

371, 125 S.Ct. 716, 722, 160 L.Ed.2d 734 (2005), *quoting* Zadvydas, 533 U.S. at 701,

121 S.Ct. at 2505.

  In Clark v. Martinez, *supra*, the Court extended its interpretation of 8 U.S.C. §

1231(a)(6) to inadmissible aliens,[7] concluding there was no reason why the removal

---

  [6] Section 1231(a)(1)(A) provides that the government has a 90-day "removal period" to remove an alien ordered removed from the United States.  8 U.S.C. § 1231(a)(1)(A).

  [7] The relevant statute provides: "An alien ordered removed who is inadmissible under section 1182 of this title, removable [for violations of nonimmigrant status or entry conditions, violations of criminal laws, or threatening national security] or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)."  8 U.S.C. § 1231(a)(6), *quoted in* Benitez v. Wallis, 402 F.3d 1133, 1134 (11th Cir. 2005).

period would be longer for an inadmissible alien than an admissible alien.  <u>Clark</u>, 543

U.S. at 386, 125 S.Ct. at 727.  Thus, the 6-month presumptive detention period

prescribed in <u>Zadvydas</u> is applicable regardless of the alien's status.  *Id.*  Accordingly,

under <u>Clark</u> and <u>Zadvydas</u>, when an alien shows that he has been held more than six

months beyond the removal period and his removal is not reasonably foreseeable, a §

2241 petition should be granted. <u>Clark</u>, 543 U.S. at 386-387, 125 S.Ct. at 727; <u>Benitez v.</u>

<u>Wallis</u>, 402 F.3d 1133, 1135 (11th Cir. 2005) (relying on Clark to hold that "an

inadmissible alien can no longer be detained beyond the statutory 90-day removal period

of § 1231(a)(1), where there was no significant likelihood of removal in the reasonable

foreseeable future.").

An exception to the six-month removal period exists under 8 U.S.C. § 1231(a)(1)

which provides that the removal period "shall be extended . . . and the alien may remain

in detention during such extended period if the alien fails or refuses to make timely

application in good faith for travel or other documents necessary to the alien's departure

or conspires or acts to prevent the alien's removal subject to an order of removal."  8

U.S.C. § 1231(a)(1)(C).[8]  Accordingly, where the alien acts or conspires to prevent his

removal, an extended period of detention is expressly permitted by statute.  Thus, in

considering whether there appears to be no significant likelihood of Petitioner's removal

in the reasonably foreseeable future, the Court must consider whether Petitioner's

removal has been delayed or extended by Petitioner's own efforts.

---

[8] During the "removal period" an alien must be detained.  8 U.S.C. § 1231(a)(2).
Petitioner's removal period began on January 24, 2004, the date on which he entered
into ICE's custody.  8 U.S.C. § 1231(a)(1)(B).

In Sango-Dema v. District Director, I.N.S., 122 F.Supp.2d 213 (D. Mass. 2000), a case decided before Zadvydas, the court denied habeas relief where the petitioner was found to be "the cause for the long delay."  The court stated, "[e]ven if this Court were to agree with the courts recognizing a constitutional right to be free from indefinite detention by the INS, an alien cannot trigger such a right with his outright refusal to cooperate with INS officials."  Sango-Dema, 122 F.Supp.2d at 221.

In Powell v. Ashcroft, 194 F.Supp.2d 209 (E.D.N.Y. 2002), the court noted that Zadvydas was concerned with the constitutionality of § 1231(a)(6) where aliens were in " ''deportation limbo because their countries of origin had refused to allow [them] entrance.' "  Powell, 194 F.Supp.2d at 211, *citing* Sango-Dema, 122 F.Supp.2d at 221 (explaining Zadvydas).  The court found that Zadvydas was inapplicable because it "did not discuss the constitutionality of Section 1231(a)(1)(C) and the tolling of the removal period during the time of an alien's non-cooperation."  Powell, 194 F.Supp.2d at 212, *citing* Guner v. Reno, 2001 WL 940576 (S.D.N.Y. Aug. 20, 2001).  The court held that petitioner's continued detention was appropriate because he had not "provide[d] accurate and complete information to the INS," and that after he did so, it was likely that he would be removed.  Powell, 194 F.Supp.2d at 212.  *See also* Archibald v. I.N.S., 2002 WL 1434391, *8 (E.D.Pa. July 1, 2002) (finding the case factually distinguishable from *Zadvydas* where "Archibald's detention [was] a direct result of his seeking relief from deportation" and holding that because his indefinite detention was a result of his requesting a stay, he could not "be heard to complain[] that the time period during which he has been detained constitute[d] a denial of due process."); Thevarajah v. McElroy,

2002 WL 923914 (E.D.N.Y. Apr. 30, 2002)(holding that petitioner's custody by INS was constitutional following *Zadvydas* because the nearly 5-year detention was lengthened largely because of petitioner's own actions); *cf.* Seretse-Khama v. Ashcroft, 215 F.Supp.2d 37 (D.D.C. July 22, 2002) (rejecting respondent's argument that petitioner "has not cooperated in obtaining travel documents because he told Liberian officials that he did not want to return to Liberia" and noting that INS had not argued that "petitioner refused to request travel documents or refused to be interviewed by Liberian officials" and did not deny his Liberian citizenship, or give "false or misleading information that impeded the issuance of travel documents.").

Another persuasive case is Pelich v. I.N.S., 329 F.3d 1057 (9th Cir. 2003), in which the court found that petitioner's detention was "indefinite only because he refuse[d] to cooperate with the Immigration and Naturalization Service's ("INS") efforts to remove him." Pelich, 329 F.3d at 1057.  In that circumstance, the court concluded that petitioner had "no cause to complain" and affirmed the denial of his § 2241 habeas petition.  329 F.3d at 1057-58.

In a case before the Eastern District of New York, the court set forth various situations which have been deemed to toll the removal period:

> Section 1231 states that if an alien acts to frustrate the INS' ability to remove him, the removal period is tolled during the period of the alien's actions. 8 U.S.C. § 1231(a)(1)(C); Powell v. Ashcroft, 194 F.Supp.2d 209, 210 (E.D.N.Y. 2002).  The limited case law on what constitutes a "frustration of removal" has not interpreted this phrase expansively: courts have only tolled the removal period in cases where the alien has sought and received a stay of removal through judicial action (*see* Akinwale v. Ashcroft, 287 F.3d 1050, 1052 (11th Cir. 2002)), or where the alien has demonstrated some sort of bad faith failure to cooperate, such as providing

the INS with false or inconsistent information regarding his identity or country of origin (*see* Powell, *supra*; Ncube v. INS, No. 98 Civ. 0282, 1998 WL 842349 at *16 (S.D.N.Y. Dec. 2, 1998)), or refusing to complete travel arrangements or name a country for deportation (Riley v. Greene, 149 F.Supp.2d 1256, 1262 (D.Colo. 2001); Sango-Dema v. District Director, 122 F.Supp.2d 213, 221 (D.Mass. 2000); *Cf.* Ford v. Quarantillo, 142 F.Supp.2d 585, 588 (D.N.J. 2001) (ordering release of alien detained for 14 months, even though he misrepresented his country of origin)).  Indeed, as Seretse-Khama has held, a petitioner's truthful statement (such as expressing that he did not wish to return to his country of origin) which is later adopted by the country of origin as a reason for not wanting to repatriate that alien, is not an example of refusal to cooperate under § 1231(a)(1)(C), and cannot be used as a grounds for extending post-removal detention.  Seretse-Khama v. Ashcroft, 215 F.Supp.2d 37, 50-53 (D.D.C. 2002).

Rajigah v. Conway, 268 F.Supp.2d 159, 165 (E.D.N.Y., 2003)(relying on the decision from Powell v. Ashcroft, *supra*).  Ultimately, the court in Rajigah concluded that the petitioner had not acted in bad faith simply because he requested a stay of removal and "availed himself of judicial process and communicated to the Guyanese embassy his plans to" file an action in court.  268 F.Supp.2d at 166[9]

Cited in Rajigah is Seretse-Khama v. Ashcroft, 215 F.Supp.2d 37 (D.D.C. 2002).  There, the court determined that simply because an alien tells the Consul of his country

---

[9] Somewhat contrary to the Rajigah decision, though, is Akinwale v. Ashcroft, 287 F.3d 1050 (11th Cir. 2002).  There, the petitioner was taken into custody by Immigration officials following release from incarceration.  287 F.3d at 1051.  He filed a habeas petition just four months into his detention, asserting he "was being indefinitely detained . . . ."  *Id.*  The petition was denied based on a finding that the petitioner had not presented "a situation involving prolonged or indefinite detention pending removal."  *Id.* In approving the dismissal of the case, the Eleventh Circuit Court of Appeals concluded that a four-month period of detention was not "prolonged" pursuant to Zadvydas, and, furthermore, the petitioner had not shown the unlikeliness of his removal in the foreseeable future. *Id.*, at 1051-52.  In a footnote, the Eleventh Circuit noted that Akinwale's filing of the stay of deportation "interrupted the running of time under Zadvydas" and acted to extend his own removal period.  *Id.*, at 1052, n.4.

of citizenship that he did not want to return, he is not hindering his removal.  215

F.Supp.2d at 51.  The court noted that the petitioner had not " refused to request travel

documents or refused to be interviewed by Liberian officials."  *Id.*  No claims were before

the court that the petitioner had denied his citizenship, "gave false or misleading

information that impeded the issuance of travel documents."  *Id.*  Petitioner truthfully

answered the Consul's questions during an interview, but simply and "honestly told the

Consul that he did not want to return to Liberia in light of his lack of family in or ties to

Liberia, which he left . . . when he was only eight years old."  *Id.*  The court concluded

that such a statement without more did not amount to a "bad faith failure to cooperate."

*Id.*[10]

---

[10] In a footnote, the court surveyed the case law on the issue of what "constitutes an affirmative act that prevents one's return" or removal:

> Furthermore, most of the case law was decided before the Court's ruling in Zadvydas.  *See, e.g.*, Bini v. Aljets, 2002 WL 535083, 36 Fed.Appx. 868 (8th Cir. 2002) (alien who obtained stay of proceedings in district court prevented his removal); Powell v. Ashcroft, 194 F.Supp.2d 209, 210-211 (E.D.N.Y. 2002) (alien who claimed in four affidavits that he was from U.S. Virgin Islands, Jamaica, Trinidad, and Canada, and provided false name and false date of entry, prevented his removal); Riley v. Greene, 149 F.Supp.2d 1256, 1262 (D.Colo. 2001) (alien who admitted he refused to complete travel arrangements and refused to name any country for deportation); Sango-Dema v. District Director, 122 F.Supp.2d 213, 221 (D.Mass. 2000) (alien who refused to provide passport and birth certificate, and refused to communicate with embassy officials or complete application for documents); Ncube v. INS, 1998 WL 842349, *16 (S.D.N.Y. Dec. 2, 1998) (failing to provide INS with passport or proof of identification or nationality; many statements false or at least contradictory); *cf.* Ford v. Quarantillo, 142 F.Supp.2d 585, 588 (D.N.J. 2001) (ordering release of alien detained for 14 months, even though he misrepresented his country of origin).

215 F.Supp.2d at 51, n.18.

In the case at bar, Petitioner's six-month period of removal pursuant to <u>Zadvydas</u> has been tolled as permitted by 8 U.S.C. § 1231(a)(1)(C).  The period of time during which Petitioner has not been cooperative has tolled the six month period of time for removal as announced in <u>Zadvydas</u>.  *See* <u>Francois v. Chertoff</u>, 2006 WL 2668193, *3 (D.N.J., 2006)(citations omitted); 8 U.S.C. § 1231(a)(1)(C).

On a multitude of separate occasions, Petitioner was issued Instruction Sheets requiring his assistance in establishing his identification and citizenship.  Petitioner has not made any effort to provide even one requested document to ICE.  Indeed, Petitioner refuses to even sign his name to show his receipt of notices from ICE.  No evidence has been submitted by Petitioner to demonstrate that he has made any effort to assist in the removal process.

Petitioner's assertion that he is owed money from the government is not good cause to refuse to assist in obtaining travel documents.  The claim to the money is facially unpersuasive.  Petitioner was not listed as the obligor on the bond.  Therefore, the Government was under no legal duty to return the bond money to Petitioner.  Instead, the bond money was returned to the obligor listed on the bond, as required by law.  Indeed, it was Petitioner who violated the conditions of the bond.

In any event, this civil dispute does not justify Petitioner's refusal to cooperate with his removal.  Assuming the truth of Petitioner's assertion (which has been made without any proof), that the bond money was his initially and was provided to Lorenzo Forrest who, in turn, signed as the obligor (a sequence of events that seems highly improbable), Petitioner's remedy is with Forrest, not with the United States government.

The Government has done nothing to impede Petitioner's civil claim.  Petitioner argued that he had to dismiss the suit because the government would not "transfer him so that he could participate in the suit . . . ."  Doc. 16, p. 5.  There is no evidence to support this contention.  There is no evidence that Petitioner ever made any request to be transported for a trial in that case, or that a deposition would not have served the same purpose.  Petitioner was represented by counsel in that suit.  It is highly unlikely that Petitioner's presence was required to pursue that civil claim, or if it was, proof of that fact would have been forthcoming from Petitioner.

Further, it is very doubtful that a civil suit would even succeed due to the statute of limitations.  The civil suit was filed in 2004, long after the Florida statute of limitations had expired.[11]  In any event, Petitioner has not had a legal proceeding to recover the bond money pending since 2005.

The Consulate of Saint Vincent and the Grenadines initially provided a travel document, and a plane ticket was purchased.  Thus, it is clear that if Petitioner were to participate in efforts to obtain a travel document, the document would be forthcoming and his detention could end.  Petitioner refuses to assist in his removal because he does not want to return without the bond money.

---

[11] An action to recover public money held by a public officer or an equitable action on a contract not founded upon a written instrument is governed by a four year statute of limitation.  FLA. STAT. § 95.11(3)(d) and (k).  An action upon a written contract is governed by a five year limitation.  FLA. STAT. § 95.11(2)(a).  The civil suit was filed in 2004.  Petitioner absconded in 1993.  Any delay in suing to recover the bond money earlier than 2004 is Petitioner's own fault.

For these reasons, Petitioner has acted to toll the removal period and his continued detention is lawful pursuant to 8 U.S.C. § 1231(a)(1).  This § 2241 petition should be denied.

Accordingly, it is **RECOMMENDED** that the petition for a writ of habeas corpus, doc. 1, filed by Walter Edwards, A91-060-021, pursuant to 28 U.S.C. § 2241, be **DENIED.**

**IN CHAMBERS** at Tallahassee, Florida, on October 2, 2007.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**



**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**